People v Pica-Torres (2024 NY Slip Op 04163)

People v Pica-Torres

2024 NY Slip Op 04163

Decided on August 8, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 8, 2024

112498
[*1]The People of the State of New York, Respondent,
v
Wilfredo Pica-Torres, Appellant.

Calendar Date:March 25, 2024

Before:Egan Jr., J.P., Lynch, Reynolds Fitzgerald, Ceresia and Powers, JJ.

Paul J. Connolly, Delmar, for appellant.
Mary E. Saitta, Special Prosecutor, Binghamton, for respondent.

Lynch, J.
Appeals (1) from a judgment of the County Court of Broome County (Kevin P. Dooley, J.), rendered August 30, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree, attempted murder in the second degree and arson in the first degree, and (2) from a judgment of said court, rendered August 30, 2019, upon a verdict convicting defendant of the crime of arson in the second degree.
Defendant was charged by indictment with several crimes related to two house fires that occurred in the City of Binghamton, Broome County on February 9, 2019. The first fire was at 109 Walnut Street and contributed to the death of Victor Banyan (hereinafter victim A). Defendant's ex-girlfriend (hereinafter victim B) was also in the Walnut Street residence at the time of the fire and was brutally assaulted by defendant but managed to escape from the burning building. The other fire allegedly occurred at 17-19 Thorp Street later that day during a standoff between defendant and police. Following a jury trial, defendant was convicted of murder in the second degree, attempted murder in the second degree, and arson in the first degree in connection with the Walnut Street fire, as well as arson in the second degree relative to the Thorp Street fire. He was sentenced, as a second felony offender, to concurrent prison terms of 25 years to life on the murder and first degree arson convictions, to run consecutively with prison terms of 25 years, followed by five years of postrelease supervision, on the attempted murder conviction and 20 years, followed by five years postrelease supervision, on the second degree arson conviction, with these two sentences also running consecutively to one another. Defendant appeals.
Defendant argues that the verdict on all counts is against the weight of the evidence and that the conviction of second degree arson relative to the Thorp Street fire is legally insufficient. We are unpersuaded. As for the charges pertaining to the Walnut Street events, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person or of a third person" (Penal Law § 125.25 [1]). A person is guilty of arson in the first degree "when he [or she] intentionally damages a building . . . by causing . . . a fire," which "causes serious physical injury to another person other than a participant" who the defendant knows "is present in [the] building" (Penal Law § 150.20 [1]). A person is guilty of attempted murder in the second degree when he or she acts with intent to cause the death of another person (see Penal Law §§ 110.00; 125.25 [1]).
At trial, victim B testified that she was in a relationship with defendant between August 2018 and December 2018. She first met defendant when she was living with victim A — whom she had previously dated — in his downstairs apartment at the Walnut Street residence. Victim B revealed that defendant abused her for much of their relationship[*2], physically assaulting her, threatening her life on several occasions and accusing her of cheating on him with victim A. Shortly after victim B separated from defendant in December 2018, he began sending her threatening text and Facebook messages. He was arrested on unrelated charges on December 22, 2018 and released from custody on February 6, 2019. The day after his release, defendant resumed sending threatening messages to victim B. In that regard, the People entered into evidence a series of threatening text messages sent on February 7, 2019, including one in which defendant told victim B, "You're going to die, I promise," and referenced victim A by name. The threats continued into the morning of February 8, 2019, with defendant telling victim B, among other things: "I know you an[d] [victim A] home tomorrow, I am going to break up that door and do something crazy."
Victim B, who was pregnant with defendant's twins at the time, slept at victim A's apartment on the evening of February 8, 2019. She testified that, as soon as she walked in the door, she received a message from defendant stating: "I just watched you walk into [victim A's] house." Victim B testified that, before going to bed, victim A turned off two kerosene heaters located in the kitchen, which he used to heat the residence. Early the next morning, victim B awoke to the sound of shuffling in the kitchen and smelled kerosene. As victim A went to investigate, victim B called 911. After hearing victim A yell out, victim B ran to assist him but slipped on what she believed was kerosene on the floor. She was then beaten unconscious by defendant, who she identified as her assailant. When victim B regained consciousness, she could hear a 911 operator on the phone and asked for help. She testified that defendant then hit her on the head with a "metal pole or pipe," but eventually stopped when the upstairs neighbors came to the back door. When victim B tried to exit the back door, she realized that it was locked from the outside. She then saw something "li[ght] on fire" in defendant's hands and "the whole kitchen . . . [went up] in flames." Thereafter, victim B saw defendant "take off" toward the front of the house. Victim B was eventually able to exit the residence, describing that she was "covered in kerosene" at the time and bleeding from her head. She was hospitalized for a day and a half after the incident. The People established that victim A died during the event, eliciting testimony that he died from blunt force trauma injuries to the skull and brain, in conjunction with smoke inhalation.
As for the circumstances leading up to the Walnut Street fire, one of defendant's sisters testified that she was with defendant at their mother's house — located next door to victim A's residence — "all day" on February 8, 2019. According to this sister, defendant left between 8:30 and 9:00 p.m. Around the same time, victim A's upstairs neighbor (hereinafter witness 1) received a call from victim [*3]A — who was out buying kerosene to heat the apartment — asking him to unlock the back door of the residence, which led to an enclosed porch and which was used as the main point of entry. The door was secured with a padlock and chain. Witness 1 obliged, unlocking the back door and hanging the key to the padlock on a nearby nail. Around 10:00 p.m., witness 1 awoke to a call from victim A, who informed him that the kitchen door located off of the enclosed porch was open when he returned to the residence. Witness 1 testified that this was suspicious because he had closed the kitchen door when he went to unlock the back door. According to witness 1, he was awoken several hours later by victim B's screams. When witness 1 ran downstairs to the back door to investigate, he noticed that it was "wedged." After a struggle, he and a roommate (hereinafter witness 2) were eventually able to open the door and victim B came running out with "blood coming down her head." Witness 1 then felt an "instant . . . rush of heat" and observed the house to be on fire. He also observed the floors to be "all wet." Witness 1's wife gave consistent testimony to this effect, explaining that she woke up around 2:45 a.m. on February 9, 2019 and heard "crashing," "banging" and "screaming" downstairs. At one point, she also heard a male voice say, "I'll set this f[******] house on fire," identifying the voice as defendant's.
Witness 2 — who was also living in the upstairs apartment at the Walnut Street residence — explained that he had accompanied victim A to purchase kerosene on the evening of February 8, 2019. When they returned, they filled the kerosene heaters located in the kitchen and then left two kerosene storage containers nearby. Witness 2 was awoken by witness 1's wife, who informed him that victim B was screaming for help. Witness 2 then heard a "man's voice . . . saying I'm going to set this house on fire," identifying defendant. Witness 2 ran downstairs, where he saw a fire. Like witness 1, witness 2 revealed that he initially could not open the back door because the "chain lock was locked on the inside with the padlock wrapped around the hinge." According to witness 2, when they were finally able to open the door, victim B came running out and she "was pretty beat up."
Both a fire investigator and an assistant fire marshall with the City of Binghamton testified that the fire started toward the rear of the home near the kitchen. A metal bar or rod was also found near the door between the kitchen and the porch, and a lug wrench was found near the rear exterior apartment door. The evidence established that the Walnut Street residence was heavily damaged in the fire.
Another one of defendant's sisters testified that she received a call from defendant on February 9, 2019, in which he admitted that he was at the Walnut Street residence at the time of the fire, but maintained that he had been assaulted by the upstairs tenants and the fire was ignited by victim B rather [*4]than himself. Defendant explained to her that after victim B walked out of the residence and called the police, he left.
On this record, there is no basis to disturb the verdict on the counts pertaining to the Walnut Street fire. Although a different verdict would not have been unreasonable had the jury believed defendant's version of the events as relayed to his sister, when viewing the evidence in a neutral light and weighing the "relative probative force of conflicting testimony and the relative strength of conflicting inferences" that may be drawn therefrom, we readily conclude that the verdict is supported by the weight of the evidence (People v Burton, 215 AD3d 1054, 1056 [3d Dept 2023], lv denied 40 NY3d 927 [2023]; see People v Harris, 177 AD3d 1199, 1202 [3d Dept 2019], lv denied 35 NY3d 970 [2020]; People v Permaul, 174 AD3d 1127, 1128 [3d Dept 2019], lv denied 34 NY3d 983 [2019]).
As for the second degree arson charge pertaining to the events at Thorp Street, the People were required to prove that defendant "intentionally damage[d] a building . . . by starting a fire . . . when (a) another person who [wa]s not a participant in the crime [wa]s present in such building . . . at the time, and (b) . . . defendant kn[ew] that fact or the circumstances [we]re such as to render the presence of such a person therein a reasonable possibility" (Penal Law § 150.15). The trial evidence showed that after police "located the suspect" at 17-19 Thorp Street — a multi-unit apartment complex — a standoff ensued, with defendant barricading himself inside of a vacant first floor apartment. Once the police deployed tear gas, defendant was successfully apprehended. Although no witness observed defendant start a fire, several police officers testified that he threatened to blow up the building and that the fire alarm went off during the standoff. The officers contemporaneously smelled smoke and saw a flickering light — consistent with flames — underneath the door to the vacant apartment. Police also located burnt clothing and garbage inside of the apartment and observed charred walls. In these circumstances, the evidence permitted a reasonable inference that defendant intentionally ignited a fire in the apartment, which damaged the walls. Moreover, since the Thorp Street property was a multi-unit apartment complex and several occupants had to be evacuated, the jury could readily conclude that defendant knew there was a reasonable possibility that other people were inside of the building at the time he lit the fire (see Penal Law § 150.15). On this record, we conclude that the arson verdict relative to the Thorp Street fire is supported by legally sufficient evidence and not against the weight of the evidence (see People v Baldwin, 173 AD3d 1748, 1748-1749 [4th Dept 2019], lv denied 34 NY3d 928 [2019]).
We are unpersuaded by defendant's argument that County Court committed a Molineux violation by admitting evidence that he had been released from prison only [*5]three days prior to the underlying crimes. Just four days prior to trial, the People filed an application seeking to admit evidence that defendant was incarcerated from December 22, 2018 to February 6, 2019. Although defense counsel initially opposed the application, the parties subsequently entered into a stipulation whereby they agreed that the court would inform the jury that "[d]efendant was incarcerated at the Broome County Jail from 5:14 p.m. on December 22nd until he was released from custody at 6:32 p.m. on February 6th." Finding that such evidence was relevant "for the purpose of explaining why there were no text message[s] or voicemails from [defendant's] cell phone to [victim B] during that timeframe," the court informed the parties that it would give a cautionary instruction to the jury to that effect and would tell them not "to speculate as to why [defendant] was in custody, or draw any negative inferences" from that fact when deliberating as to his guilt on the underlying crimes. The court so informed the jury on two separate occasions. Having so stipulated, defendant effectively waived any objection. In any event, this evidence was limited in scope, not unduly prejudicial, and necessary to complete the narrative of why defendant's barrage of threatening messages suddenly ceased during this time frame and then promptly resumed (see People v Restifo, 220 AD3d 1113, 1118 [3d Dept 2023], lv denied 40 NY3d 1094 [2024]). In these circumstances, County Court's ruling was not an abuse of discretion (see People v Hebert, 218 AD3d 1003, 1010 [3d Dept 2023], lv denied 40 NY3d 1080 [2023]; People v Curran, 139 AD3d 1085, 1086-1087 [2d Dept 2016], lv denied 31 NY3d 1080 [2018]).
Next, defendant maintains that County Court abused its discretion in allowing the People to enter into evidence eight photographs taken during victim A's autopsy, marked as People's exhibit Nos. 112-120. Defendant did not preserve his argument relative to photographs Nos. 112-117, as his attorney challenged only the admission of photographs Nos. 118-120 (see CPL 470.05 [2]). As for the propriety of County Court's ruling admitting those three photographs, "[t]he general rule with respect to photographs of a victim's deceased body is that they are admissible if they tend to prove or disprove a disputed or material issue, to illustrate or elucidate other relevant evidence, or to corroborate or disprove some other evidence offered and should be excluded only if their sole purpose is to arouse the emotions of the jury and to prejudice the defendant" (People v Serrano, 173 AD3d 1484, 1488 [3d Dept 2019] [internal quotation marks and citations omitted], lv denied 34 NY3d 937 [2019]; accord People v Wood, 79 NY2d 958, 960 [1992]; see People v Stevens, 76 NY2d 833, 835-836 [1990]; People v Pobliner, 32 NY2d 356, 369-370 [1973]).
At trial, the forensic pathologist who performed victim A's autopsy testified that his death was caused by a combination of blunt force trauma to the head [*6]stemming from an assault, as well as smoke inhalation. He clarified, however, that the findings suggested that victim A "died before his carbon monoxide level got high enough to be the primary cause of . . . death." In our view, photographs Nos. 118-120 were probative of these findings. Although gruesome in nature, the pathologist highlighted areas depicted in these photographs showing evidence of blunt force trauma to victim A' skull and brain, as well as soot deposition in his tracheal tube, indicating that he had been assaulted by defendant and was alive and "breathing in . . . smoke at the time of the fire." As such, the photographs were relevant to prove the extent of blunt force trauma inflicted upon victim A by defendant, which was probative of defendant's intent relevant to the murder charge (see People v Stover, 178 AD3d 1138, 1144 [3d Dept 2019], lv denied 34 NY3d 1163 [2020]). The photograph depicting evidence of smoke inhalation was also probative to the first degree arson charge, which required the People to prove that the fire set by defendant was intended to cause serious physical injury to victim A (see Penal Law § 150.20 [1]). While defendant did not contest victim A's cause of death, we cannot conclude that the admission of these three photographs was an abuse of discretion.
Recognizing that his argument challenging the admission of photographs Nos. 112-117 is unpreserved, defendant maintains that his counsel's failure to object to the admission of these photographs amounted to ineffective assistance of counsel. Photographs Nos. 115-117 showed blunt force trauma injuries to victim A's skull and, as explained above, were probative of the issue of intent regarding the murder charge. Accordingly, any objection to the admission of these photographs would have had little chance of success and the failure to object did not amount to ineffective assistance (see generally People v Caban, 5 NY3d 143, 152 [2005]). As for photographs Nos. 112 and 113, depicting victim A's charred corpse, we agree with defendant that they were "extremely disturbing" and served no material purpose other than to show that victim A died in a fire —an issue that was not contested. Accordingly, defense counsel was remiss in failing to object to the admission of photographs Nos. 112 and 113. Nevertheless, considering that the jury was properly allowed to observe photographs Nos. 115-120 and the overwhelming evidence of guilt, we conclude that the admission of these additional photographs was harmless error (see People v Stover, 178 AD3d at 1144; compare People v Lewis, 178 AD3d 952, 953 [2d Dept 2019]).
Having failed to object to the jury charge as given, defendant did not preserve his contention that County Court erred in failing to instruct the jury that, if it found him guilty of the Walnut Street arson, it could not infer therefrom that he was also guilty of the Thorp Street arson (see CPL 470.05 [2]; People v Cotto, 218 AD3d 1021, 1025 [3d Dept 2023], lv denied [*7]40 NY3d 1039 [2023]). We are unpersuaded by defendant's argument that counsel's failure to request such a charge deprived him of meaningful representation (see People v Gaylord, 224 AD3d 1169, 1172-1173 [3d Dept 2024]). Considering the record as a whole, we find that defendant received meaningful representation.
As for defendant's remaining contentions, we agree that County Court improperly ran the sentence on the attempted murder conviction (count 3) consecutively with the sentences on the convictions of second degree murder (count 1) and first degree arson (count 2).[FN1] Pursuant to Penal Law § 70.25 (2), "[w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission, or through an act or omission which in itself constituted one of the offenses and also was a material element of the other, the sentences . . . must run concurrently." Moreover, "where the actus reus is a single inseparable act that violates more than one statute, a single punishment must be imposed" (People v Brahney, 29 NY3d 10, 15 [2017] [internal quotation marks, brackets and citations omitted]; see People v Hall, 188 AD3d 1416, 1417 [3d Dept 2020], lv denied 36 NY3d 1051 [2021]). Correspondingly, "consecutive sentences may be imposed when either the elements of the crimes do not overlap or if the facts demonstrate that the defendant's acts underlying the crimes are separate and distinct" (People v Ramirez, 89 NY2d 444, 451 [1996]; see People v Graham, 215 AD3d 998, 1009 [3d Dept 2023], lv denied 40 NY3d 928 [2023]). The People bear the burden of establishing the legality of consecutive sentences and "may meet their burden . . . by identifying the facts which support their view from the record" (People v Brahney, 29 NY3d at 15 [internal quotation marks, ellipses and citations omitted]).
Count 3 of indictment No. 19-114 charged defendant with attempted murder in the second degree relative to actions directed at victim B, and counts 1 and 2 charged murder in the second degree and arson in the first degree relative to his conduct of intentionally starting a fire that damaged a building and contributed to victim A's death. The trial evidence established that defendant locked victim A and victim B inside of the Walnut Street residence, bludgeoned them both with a blunt object and then lit the house on fire, trapping them inside of a burning building. Although the People argue that the evidence supported a finding that defendant attempted to murder victim B by striking her in the head before lighting the fire, the indictment did not specify this conduct as the predicate underlying the attempted murder charge. In response to defendant's demand for a bill of particulars, however, the People specified that defendant repeatedly hit victim B and "also set fire to the house, trapping [victim B] inside and leaving her to die." On summation, the prosecutor suggested that defendant attempted to murder victim B by lighting [*8]a fire after trapping her inside of the Walnut Street residence (see generally People v Parks, 95 NY2d 811, 815 [2000]). Defendant's murder of victim A and his attempted murder of victim B were materially tied to his act of lighting the house on fire, which was the same act that formed the basis of the first degree arson charge. As the actus reus of all three crimes constituted a single, inseparable act, concurrent sentences were statutorily required (see Penal Law § 70.25 [2]). The judgment is modified accordingly. We otherwise do not find the sentence imposed to be unduly harsh or severe and decline defendant's request to reduce it in the interest of justice (see CPL 470.15 [6]; People v Kilgore, 218 AD3d 1054, 1058 [3d Dept 2023], lv denied 40 NY3d 1081 [2023]). Defendant's remaining contentions, to the extent not specifically addressed, have been considered and found lacking in merit.
Egan Jr., J.P., Reynolds Fitzgerald, Ceresia and Powers, JJ., concur.
ORDERED that the judgment on indictment No. 19-114 is modified, on the law, without costs, by directing that the sentence imposed for attempted murder in the second degree under count 3 of the indictment shall run concurrently with the sentences imposed for murder in the second degree and arson in the first degree under counts 1 and 2; and, as so modified, affirmed.
ORDERED that the judgment on indictment No. 19-279 is affirmed.

Footnotes

Footnote 1: Contrary to the People's contention that defendant waived this argument by failing to object to the consecutive sentences or to file a CPL article 440 motion to that effect, whether defendant received a lawful sentence falls outside of the preservation rule (see People v Redden, 182 AD3d 926, 927 n [3d Dept 2020], lv denied 35 NY3d 1115 [2020]; People v Amato, 1 AD3d 713,716 n [3d Dept 2003], lv denied 1 NY3d 594 [2004]).