People v Hebert (2023 NY Slip Op 03947)

People v Hebert

2023 NY Slip Op 03947

Decided on July 27, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:July 27, 2023

111777
[*1]The People of the State of New York, Respondent,
v
Christopher A. Hebert, Appellant.

Calendar Date:June 5, 2023

Before:Garry, P.J., Lynch, Clark, Aarons and Ceresia, JJ.

Rural Law Center of New York, Inc., Plattsburgh (Kristin A. Bluvas of counsel), for appellant.
Gary M. Pasqua, District Attorney, Canton (Matthew L. Peabody of counsel), for respondent.

Lynch, J.
Appeal from a judgment of the County Court of St. Lawrence County (Jerome J. Richards, J.), rendered April 11, 2019, upon a verdict convicting defendant of the crime of murder in the second degree.
In June 2018, defendant was charged by indictment with murder in the second degree in connection with an alleged homicide that occurred in the Village of Massena, St. Lawrence County approximately four years earlier. Following a jury trial, he was convicted as charged and sentenced to a prison term of 25 years to life. Defendant appeals.
Defendant argues that the verdict is legally insufficient and against the weight of the evidence because the proof of his involvement in the victim's death consisted solely of his statements to friends, which were not sufficiently corroborated. We disagree.[FN1] Pertinent here, "[a] person is guilty of murder in the second degree when[,] . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). Under CPL 60.50, "[a] person may not be convicted of an[ ] offense solely upon evidence of a confession or admission made by him [or her] without additional proof that the offense charged has been committed." "The requirements of the rule are not rigorous and sufficient corroboration exists when the confession is 'supported' by independent evidence of corpus delecti" (People v Booden, 69 NY2d 185, 187 [1987] [citations omitted]). "[T]he additional proof required need not corroborate every detail of the confession, may be either direct or circumstantial and does not have to connect [the] defendant to the crime" (People v Morgan, 246 AD2d 686, 686 [3d Dept 1998] [internal citation omitted], lv denied 91 NY2d 975 [1998]; see People v Lipsky, 57 NY2d 560, 571 [1982]). The statute is satisfied by "some proof, of whatever weight, that the offense charged has in fact been committed by someone" (People v Booden, 69 NY2d at 187 [internal quotation marks and citation omitted]). Even when corroboration exists, "the evidence as a whole must . . . establish guilt beyond a reasonable doubt" (id.).
At trial, the People elicited testimony that the victim went missing in early June 2014. Defendant was arrested shortly thereafter — on or around June 12, 2014 — on unrelated charges. Prior to the victim's disappearance, she and defendant had been using cocaine at Gerald Dissottle's residence over the course of several hours. Dissottle testified that, on the date they were all together, the victim left his house around 8:30 p.m. to retrieve guns she had hidden behind her grandfather's house as a form of payment to defendant for the cocaine. Defendant accompanied her on this trip and they left in a black F-150 pickup truck belonging to Dissottle's sister, who was defendant's sister-in-law. Approximately 30 minutes later, Dissottle received a call from defendant asking if he had already retrieved the guns because they were not in the location the victim described. Dissottle responded[*2], "You just left me. I haven't been any place." According to Dissottle, defendant hung up and then called back "a couple minutes later," at which time Dissottle "heard some yelling" in the background, with the victim stating, "you're crazy, . . . what's wrong with you . . . stop" and "why are you doing this."
Justin Lashomb also gave testimony relative to defendant's involvement in the victim's disappearance. To that end, Lashomb testified that, in or around June 2014, defendant came to his house in a "[b]lack Ford [t]ruck" and "told [him] about [a] murder." More specifically, Lashomb recounted that, when he got into defendant's truck, defendant stated that he needed help because he had just "killed somebody," explaining that "some girl had ripped him off," he "assaulted her" and decided to "finish her" because he had a prior violent felony conviction. Lashomb, who was sitting on a rock on the seat of the truck, recalled defendant stating that he was sitting on the murder weapon. Defendant also asked Lashomb if he had a shovel, which Lashomb did not provide.
Jason Scott Smith, another friend, also saw defendant shortly after the victim's disappearance. He testified that he received a text message from defendant one evening in June 2014 asking if he could stop by his residence. Smith testified that, upon arriving, defendant was crying, stated that he had "killed a girl" and informed Smith that he had gone to Lashomb's residence asking for shovels. Defendant told Smith that he had been partying with the victim — who he referenced by name — and had "passed out." He further told Smith that, when he awoke, "money was missing," he brought the victim to the industrial park and he "freaked out on her [and] started hitting her with a rock in the head." Realizing that his criminal history exposed him to a similar amount of jail time regardless of whether he was charged with assault or murder, Smith recalled defendant stating that he choked the victim to death and disposed of the body in a wooded area of the industrial park. Defendant then asked Smith "for a pair of shoes[,] . . . a hoodie . . . and some money to go get some shovels and some hacksaws," which Smith provided.
The People also elicited testimony from defendant's former girlfriend (hereinafter the girlfriend), who received a telephone call from defendant around the second week of June 2014. The girlfriend described defendant's demeanor on the call as "extremely frantic" and "very erratic," relaying that "a man had robbed him, and that he had taken this man to the woods to beat him up to try and get his money back, but the guy did not have his money." Defendant shared with the girlfriend that he was going to end up going to prison so he had killed this individual. The girlfriend spoke with defendant a couple more times after this initial conversation, during which he relayed that he had wrapped the body in a tarp and had asked Smith to help him move it. Although the girlfriend did not notify [*3]police at that point, Smith and Lashomb were arrested in August 2018 for stealing catalytic converters from the industrial park and, during their incarcerations, shared with police information about the location of the victim's skeletal remains as relayed by defendant, which were ultimately found wrapped in a tarp in that location. Police also located the victim's clothing near her remains.
The girlfriend, who was no longer romantically involved with defendant, also began cooperating with law enforcement and visited defendant in jail on two occasions in 2017 while he was incarcerated on unrelated charges. The girlfriend surreptitiously recorded their conversations during these visits and her recordings were played for the jury. During one conversation, the girlfriend confronted defendant with the fact that, when he called her frantically in June 2014, he told her that he had killed a man, but the newspapers were reporting that a woman had been killed. In response, defendant stated that he let her assume the victim was a man but he never actually told her that. During the conversation, the girlfriend referred to the victim by name and asked if she was the individual defendant had killed; defendant replied in the affirmative. He also told the girlfriend that he had hit the victim in the face several times, "caved her skull in" with some sort of tool and the victim stated, "[y]ou killed me already, I'm dead." Defendant also recounted telling the victim to "just go to the light" and then he "choked her out." On these recordings, defendant indicated that his June 12, 2014 arrest and subsequent incarceration on unrelated charges was going to be his alibi with respect to the victim's disappearance. Following these recordings, defendant was indicted on the underlying murder charge. Thereafter, James Waite, an individual who encountered defendant in jail, recalled a conversation he had with defendant regarding the victim's death. He explained that, when he and defendant were watching television together in jail, the victim's picture came on the screen and defendant stated that she "[did not] look like that the last time he s[aw] her."
As for the physical evidence, an autopsy of the victim's skeletal remains was inconclusive about the manner of death given that no tissue was present on the victim's body, purportedly due to the lapse of time in discovering the remains. The medical examiner who performed the autopsy noted that the victim's hyoid bone and skull showed no evidence of trauma, but explained that this did not rule out strangulation or blunt force trauma, as the hyoid bone is often not damaged in strangulation cases involving young people and that trauma is not always visible on a skull and is easier to identify when the skin and scalp are intact.
After the close of the People's direct case, defendant took the stand and gave a different account of the victim's death. He confirmed that he and the victim had been at Dissottle's house in early June [*4]2014, where they "sho[t] cocaine" with an IV needle over the course of several hours. He also confirmed that, to pay for the cocaine, the victim relayed a plan to provide defendant with guns that she had hidden in the industrial park, but wanted to wait until nighttime to retrieve them. Defendant testified that, when he and the victim left Dissottle's house, it was still light outside and they drove to his mother's house in a truck belonging to Dissottle's sister, where they remained for approximately 40 minutes and "went for a four-wheeler ride." When it was close to sunset, defendant and the victim then proceeded to the industrial park to retrieve the guns, but they remained in the truck until it was dark outside and continued to shoot cocaine. Defendant then started to feel ill and exited the vehicle. He testified that, when he got back inside, the victim was slumped over without a pulse, having overdosed. Rather than calling an ambulance, defendant explained that he continued to look for the guns to give to Lashomb because Lashomb was his cocaine dealer and defendant owed him $3,000. However, when defendant failed to locate any guns, he removed the victim from the truck and left her body in a wooded area in the industrial park, explaining that he did not want to go back to jail. He also took her clothes off because he did not want to leave any DNA, but felt bad about it so he covered her with a tarp.
Defendant maintained that he subsequently drove to Lashomb's house and, on the way there, came up with a story that he had killed the victim because he "c[ouldn't] tell [Lashomb] that some girl just [overdosed] on his drugs" or else Lashomb would stop giving him cocaine. Defendant explained that he grabbed a rock and put in on the seat of his vehicle to make his story more believable and also repeated it to Smith because he knew he would speak with Lashomb. Defendant testified that he told the girlfriend a different story about killing a man because she was jealous of other women and "would have freaked out" if she knew he had been with a woman. Defendant further explained that the reference to the victim stating, "Okay, you killed me already, I'm dead" was based off a Steven King novel and that he made this statement up to give his story more authenticity.
When viewing the foregoing evidence in the light most favorable to the People, we readily conclude that the evidence was legally sufficient to support the verdict. Although defendant could not be convicted solely upon his statements to others, there was significant evidence that corroborated the commission of a crime, including the fact that the victim's skeletal remains, clothing and a tarp were found in the precise location relayed by defendant (see People v Lipsky, 57 NY2d at 571; People v Thompson, 75 AD3d 760, 764 [3d Dept 2010], lv denied 15 NY3d 896 [2010]). There was also testimony that Lashomb heard the victim yelling when defendant called him on the evening in question, as well as [*5]evidence that defendant was frantic around the time of the victim's disappearance. On this record, the corroboration requirement of CPL 60.50 was satisfied (see People v Murray, 40 NY2d 327, 332-333 [1976], cert denied 430 US 948 [1977]; People v Moore, 185 AD3d 1544, 1544 [4th Dept 2020], lv denied 35 NY3d 1096 [2020]). With respect to the weight of the evidence, a different verdict would not have been unreasonable had the jury believed defendant's testimony. An autopsy of the victim's skeletal remains was inconclusive about the manner of death and could not conclusively confirm — or, for that matter, rule out — blunt force trauma or strangulation. Moreover, there were credibility issues with respect to the People's fact witnesses. Nevertheless, these issues were explored at trial and, when "weigh[ing] the probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn [therefrom]," we are satisfied that the People proved defendant's guilt beyond a reasonable doubt (People v Thompson, 75 AD3d at 762 [internal quotation marks and citations omitted]; accord People v Truitt, 213 AD3d 1145, 1149-1150 [3d Dept 2023], lv denied 39 NY3d 1144 [2023]).
We are similarly unpersuaded by defendant's argument that County Court erred in permitting the People to elicit Molineux evidence concerning the circumstances underlying his June 2014 arrest on unrelated charges. "While not admissible to demonstrate bad character generally or a propensity to commit the charged crimes, evidence of uncharged crimes or bad acts may be admitted if it establishes an element of the crime charged, . . . is inextricably interwoven with the charged crime, provides necessary background, . . . completes a witness's narrative, or falls within the five general Molineux exceptions" (People v Pham, 118 AD3d 1159, 1161 [3d Dept 2014] [internal quotation marks, brackets and citations omitted], lv denied 24 NY3d 1087 [2014]; see People v Gaylord, 194 AD3d 1189, 1192 [3d Dept 2021], lv denied 37 NY3d 972 [2021]) — i.e., "motive, intent, absence of mistake, common plan or scheme and identity" (People v Gaylord, 194 AD3d at 1193 [internal quotation marks and citations omitted]). "When such evidence is relevant to 'a proper nonpropensity purpose, the decision whether to admit [it] . . . rests upon the trial court's discretionary balancing of probative value and unfair prejudice' " (People v Scaringe, 137 AD3d 1409, 1416 [3d Dept 2016], lv denied 28 NY3d 936 [2016], quoting People v Dorm, 12 NY3d 16, 19 [2009]).
Prior to trial, the People submitted a written Molineux application seeking to introduce, among other things, evidence that defendant was involved in a police chase during the early morning hours of June 12, 2014 after a police officer, who was engaged in narcotics surveillance, attempted to initiate a traffic stop. During the chase, defendant evaded the officer by hitting the patrol vehicle with the F-150 truck he was driving. A foot chase [*6]ensued and defendant was ultimately apprehended at Dissottle's residence and arrested. During a subsequent court appearance before trial, the People explained that they sought to elicit such information to provide a timeline of the victim's death because the relevant witnesses were unable to recall with specificity when they had interactions with defendant relative thereto and were expected to testify that the interactions occurred "a couple days before he got into the police chase." County Court permitted the People to inquire about the underlying circumstances of the June 12, 2014 incident — including that defendant fled when an officer tried to pull him over, crashed into the patrol vehicle to evade capture, and then fled on foot — but precluded inquiry into the fact that he was stopped because he was a target of a narcotics surveillance operation.
Contrary to defendant's argument, permitting inquiry into the June 12, 2014 incident was not unduly prejudicial. Such testimony was relevant to provide a time frame for the victim's disappearance, as the witnesses could not recall with specificity the precise date they spoke with defendant about the victim, instead using the June 12, 2014 "accident" and "car chase" as a reference point. Given these references, permitting the People to inquire about the underlying circumstances of the police chase was necessary to complete the narrative so as not to confuse the jury. Although County Court did not explicitly engage in the required Molineux balancing, it impliedly did so by precluding evidence that police initiated a traffic stop because defendant was the subject of a narcotics investigation (compare People v Scaringe, 137 AD3d at 1417). In these circumstances, County Court's ruling was not an abuse of discretion (see People v Gaylord, 194 AD3d at 1194; People v Gannon, 174 AD3d 1054, 1059 [3d Dept 2019], lv denied 34 NY3d 980 [2019]), and any prejudice was appropriately dissipated by the court's instruction to the jury that "the facts of this incident are not proof whatsoever that [defendant] engaged in [the] crime that he's accused of" (see People v Gannon, 174 AD3d at 1059).
Defendant raises an additional Molineux argument directed at his recorded jail conversations with the girlfriend, claiming that it was error to permit the jury to hear portions of the recordings that referenced past incidents of domestic violence between them. We agree with defendant that such evidence of domestic violence was highly prejudicial, as it indicated that defendant had a propensity to commit violence against women and lacked probative value in the context of this prosecution (compare People v Taylor, 210 AD3d 807, 808 [2d Dept 2022], lv denied 39 NY3d 1143 [2023]; People v Knox, 167 AD3d 1324, 1326 [3d Dept 2018], lv denied 33 NY3d 950 [2019]). Nor were the references to the past domestic violence incidents inextricably interwoven into the conversation between defendant and the girlfriend about the victim's death. [*7]Nevertheless, County Court specifically instructed the jury that these references could not be used as "proof that . . . defendant may have a propensity to commit the crime charged" and could not be "consider[ed] for that purpose." On this record, we conclude that the error was harmless, as "[t]here was overwhelming evidence of defendant's guilt, and no significant probability exist[ed] that defendant would have been acquitted but for" County Court's error in admitting this evidence (People v Damon, 200 AD3d 1323, 1326 [3d Dept 2021]). Finally, as defendant did not object to the limiting instructions provided by County Court with respect to the Molineux issues, his challenge thereto is unpreserved (see People v Chappell, 198 AD3d 1018, 1020 [3d Dept 2021], lv denied 37 NY3d 1160 [2022]).
Next, defendant argues that County Court erred when it ruled that he opened the door to being cross-examined about his prior convictions beyond the bounds of the pretrial Sandoval ruling. We disagree. Prior to trial, County Court granted the People's Sandoval application to the extent of permitting inquiry, should defendant choose to testify, into the fact that he was convicted of a felony in 2001, a misdemeanor in 1999 and criminal mischief in 2015, without regard to the underlying facts of the convictions. The court precluded questioning about a conviction from 1994 as too remote, but cautioned that further questioning might be allowed if defendant opened the door at trial. While on the stand, defendant was questioned about his criminal history within the bounds of this Sandoval ruling. He also testified on direct examination that he told Lashomb a made-up story about murdering the victim so that he would appear "gangster" in the hopes that Lashomb would provide him with more free drugs. Given this extraordinary explanation, the People sought to further cross-examine defendant about "how many times he's been to a facility and what he's been to a facility for," and County Court granted the People's request, concluding that defendant had opened the door. The prosecutor asked defendant why he made up a story about killing the victim and defendant replied, "[t]o make myself look cooler than I am." The prosecutor then asked defendant leading questions about convictions from 1992, 1994 and 2001 — including the nature of the underlying crimes — and pointed out that some of those convictions were for violent felonies and that he had served jail time, revealing the length of his sentences. The prosecutor then asked defendant, "[b]ut you don't have a reputation as a gangster?" Although the prosecutor's further inquiry clearly exceeded the scope of the pretrial Sandoval ruling, we conclude that County Court did not abuse its discretion in allowing the People to engage in this questioning in response to defendant's unusual explanation that his admissions were made only to enhance his criminal reputation. The fact that defendant had a long criminal history was relevant impeachment [*8]evidence calling into question defendant's narrative (see People v Heiserman, 212 AD3d 949, 950 [3d Dept 2023], lv denied 39 NY3d 1141 [2023]; People v George, 199 AD3d 1064, 1066 [3d Dept 2021], lv denied 37 NY3d 1146 [2021]). Moreover, the questioning was brief in duration, limited in scope, and did not go into the underlying facts of the convictions. County Court also appropriately instructed the jury that defendant's past criminal history was "not proof that . . . defendant committed this crime" and was being offered "to allow [the jury] to determine whether or not [he's] telling the truth . . . and only for that purpose."
Nor was it reversible error for County Court to admit an 880-page exhibit consisting of records from a phone associated with the victim's Facebook account. At trial, the People entered into evidence, as exhibit No. 72, a "Mobile Device Examination Report" that contained the victim's cell phone data from around the time of her disappearance. In addition to the victim's call history, the report contained pictures of the victim while she was alive, as well as Facebook chat messages and photographs of friends, children and pets. Defendant argues that these pictures were "irrelevant to the People's case" and "improperly appealed to the juror's sympathies." The latter argument is unpreserved, as defense counsel objected to the report's admission solely on relevance and foundational grounds (see CPL 470.05 [2]). In any event, the photographs were relevant to establishing that the phone belonged to the victim, were not gruesome in nature and were not meant to inflame the jury (see generally People v Stevens, 76 NY2d 833, 835-836 [1990]; People v Sing Yuen Chen, 253 AD2d 898, 898 [2d Dept 1998], lv denied 92 NY2d 1038 [1998]). As such, we find no abuse of discretion in admitting this exhibit. Defendant also argues that People's exhibit No. 82, which depicts cell phone data from the relevant time period, should not have been admitted into evidence because the People did not establish that this data was extracted from the victim's phone, emphasizing that the phone number depicted on this exhibit is different from the one listed in exhibit No. 72. Although we agree with defendant that the People failed to establish that the data contained in exhibit No. 82 came from the victim's phone, the victim's cell phone data was of limited probative value in this prosecution and, in any event, we conclude that the error was harmless (see People v Saunders, 176 AD3d 1384, 1391 [3d Dept 2019], lv denied 35 NY3d 973 [2020]; People v Lawrence, 141 AD3d 1079, 1083 [4th Dept 2016], lv denied 28 NY3d 1029 [2016]).
We are similarly unpersuaded by defendant's claim that County Court erred with respect to how it handled a juror issue. During a recess on the third day of trial, juror No. 5 brought to the court's attention — outside the presence of the other jurors — that her sister worked as a nurse at the jail where defendant was incarcerated. This juror [*9]informed the court that, a day prior, defendant had approached the sister to inform her that he knew juror No. 5 was on the jury. Following inquiry by County Court and the parties as to whether juror No. 5 could remain impartial, the court ultimately indicated that it would discharge juror No. 5 as grossly unqualified (see CPL 270.35). Before doing so, however, the court asked this juror whether she had discussed the matter with the other jurors and she confirmed that she had not. She was then formally discharged.
Defendant does not challenge County Court's decision to discharge juror No. 5 as grossly unqualified.[FN2] Rather, he argues that the court committed a mode of proceedings error when it failed to inquire of the other jurors whether they had knowledge of the circumstances underlying juror No. 5's removal — an inquiry he did not request. A mode of proceedings error is one that goes "to the essential validity of the process and [is] so fundamental that the entire trial is irreparably tainted" (People v King, 27 NY3d 147, 153 [2016] [internal quotation marks and citation omitted]). "Aside from this tightly circumscribed class of claims, other types of legal issues — including most errors of constitutional dimension — must be preserved in the trial court" (People v Stephenson, 205 AD3d 1217, 1219 [3d Dept 2022] [internal quotation marks, ellipsis and citations omitted], lv denied 38 NY3d 1153 [2022]; see People v Alicea, 276 AD2d 915, 917 [3d Dept 2000], lv denied 96 NY2d 780 [2001]). Here, juror No. 5 specifically confirmed that she had not disclosed the issue to the other jurors, and the record does not support defendant's argument that County Court somehow influenced juror No. 5's response. That County Court did not conduct a further inquiry of each individual juror about juror No. 5's removal does not qualify as a mode of proceedings error (see People v King, 27 NY3d at 153).
Defendant also claims that it was a mode of proceedings error for County Court to allow the jury to continue deliberations in a room with the window open after being informed that the jurors could be overheard. Pertinent to this issue, "the 'right to a trial by jury in criminal cases is fundamental to the American scheme of justice and essential to a fair trial. At the heart of this right is the need to ensure that jury deliberations are conducted in secret, and not influenced or intruded upon by outside factors' " (People v Jones, 202 AD3d 1285, 1289 [3d Dept 2022] [internal quotation marks and citation omitted], quoting People v Rivera, 15 NY3d 207, 211 [2010]). Pursuant to the statutory requirements, "the jury must retire to deliberate upon its verdict in a place outside the courtroom. It must be provided with suitable accommodations therefor and must . . . be continuously kept together under the supervision of a court officer or court officers. . . . Except when so authorized by the court or when performing administerial duties with respect to the jurors, such court [*10]officers or public servants, as the case may be, may not speak to or communicate with them or permit any other person to do so" (CPL 310.10 [1]).
While the jury was deliberating, a court officer informed County Court that the windows in the jury room were open and that another court officer, who was "downstairs[,] outside," could "hear everything they were saying." In response, the court instructed a court officer to knock on the door and tell the jury to stop deliberating. The court called the jury back to the courtroom and advised that it was acceptable to have the windows open in the deliberation room, but they "need[ed] to keep [their] volume down so that no one ha[d] access to [their] deliberations," explaining that a court officer could hear them. Defendant did not object and we find no mode of proceedings error (compare People v Jones, 202 AD3d at 1289). There is no indication that the jury deliberations were overheard by anyone other than a single court officer — an individual who, by statute, is tasked with supervising deliberations (see CPL 310.10 [1]) and who promptly reported the problem to the court. It is clear that the jury was under "the supervision of an appropriate public servant" in this regard and, upon becoming aware of the issue, County Court immediately took appropriate corrective measures (CPL 310.10 [1]; see CPL 310.10 [2]). There is no indication that the jury was influenced or intruded upon in any way such that the fundamental right to secret deliberations was compromised (compare People v Jones, 202 AD3d at 1289).
Defendant's remaining claims are not persuasive. His claim of prosecutorial misconduct is largely unpreserved (see People v Johnson, 183 AD3d 77, 89 [3d Dept 2020], lv denied 35 NY3d 993 [2020]) and, in any event, without merit. The challenged statements and lines of inquiry by the prosecutor were either fair commentary on the evidence, necessary to complete a narrative, or were not so egregious as to deprive defendant of a fair trial (see People v Thomas, 215 AD3d 1052, 1054 [3d Dept 2023], lv denied ___ NY3d ___ [June 30, 2023]; People v Sevilla-Rosales, 206 AD3d 1247, 1249 [3d Dept 2022], lv denied 38 NY3d 1153 [2022]). We are similarly unpersuaded by defendant's ineffective assistance of counsel claim, which is based upon the cumulative effect of several alleged errors. Among the most notable is defendant's argument that he was deprived of meaningful representation when one of his two defense attorneys undertook the cross-examination of a witness who the attorney had represented in a prior criminal matter. "A defendant's right to the effective assistance of counsel includes the right to be represented by an attorney who has no conflicts and is 'singlemindedly devoted to the client's best interests' " (People v Peters, 157 AD3d 79, 83 [1st Dept 2017] [citations omitted], lv denied 30 NY3d 1118 [2018], quoting People v Berroa, 99 NY2d 134, 139 [2002]). With respect to this issue, at a December 17, 2018 status [*11]conference prior to trial — after defendant's prior attorney had been relieved due to an irretrievable breakdown of the attorney-client relationship — County Court noted that it had secured two attorneys to represent defendant, one of whom was Peter A. Dumas. The court then informed defendant that "at one point in time, . . . Dumas represented . . . Dis[s]ott[le] on a plea over in Franklin County," but the court did not think this was a conflict of interest prejudicing defendant and noted that the second attorney it was assigning to represent him could undertake Dissottle's cross-examination. The court then instructed the two defense attorneys "not to have any conversations with each other about" Dissottle, and Dumas assured the court that Dissottle had not relayed "any confidential information" during the course of his representation. Ultimately, Dumas — rather than the other defense attorney — engaged in the cross-examination of Dissottle, eliciting testimony about his extensive criminal history and impeaching his credibility through prior inconsistent statements regarding the underlying matter.
Contrary to County Court's determination, defendant "demonstrated the existence of a potential conflict of interest since his trial attorney . . . previously represented an important prosecution witness" (People v Harris, 99 NY2d 202, 211 [2002]). That said, Dumas confirmed that he had received no confidential information from Dissottle, engaged in an effective cross-examination of him, and the record "supports the conclusion that the potential conflict did not operate on the defense" (id.). In these circumstances, we cannot conclude that Dumas' cross-examination of Dissottle, despite his prior, limited representation, deprived defendant of meaningful representation (see id.; compare People v Peters, 157 AD3d at 83). We have considered defendant's remaining ineffective assistance of counsel claims, as well as any additional contentions that have not been expressly addressed, and find them to be unavailing.
Garry, P.J., Clark, Aarons and Ceresia, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Contrary to the People's contention, defendant's legal sufficiency claim is adequately preserved (see People v Hawkins, 11 NY3d 484, 492 [2008]).

Footnote 2: Indeed, no such argument could be made, as he advocated for disqualification of the juror below.