People v Bohn (2025 NY Slip Op 05846)

People v Bohn

2025 NY Slip Op 05846

Decided on October 23, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 23, 2025

111163
[*1]The People of the State of New York, Respondent,
v
Dorain G. Bohn, Appellant.

Calendar Date:September 4, 2025

Before:Garry, P.J., Clark, Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Kevin A. Jones, Public Defender, Ithaca, for appellant, and appellant pro se.
Patrick A. Perfetti, District Attorney, Cortland, for respondent.

Clark, J.
Appeal from a judgment of the County Court of Cortland County (Julie Campbell, J.), rendered March 28, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree, manslaughter in the first degree and endangering the welfare of a child.
On the evening of April 19, 2018, defendant called 911 and reported that the two-year-old daughter (hereinafter the victim) of his girlfriend (hereinafter the mother) had fallen off the top bunk of a bunk bed and did not appear to be breathing. Despite significant efforts by first responders to resuscitate the victim, she succumbed to her injuries. First responders observed what appeared to be fresh bruises on several areas of the victim's body and an autopsy revealed that she died from a depressed skull fracture
that caused catastrophic cerebral hemorrhaging. The autopsy report also listed "[f]resh hemorrhage[s]" in the mesentery of the small intestine and in the ano-rectal region that were "consistent with blunt trauma," and confirmed the existence of over 50 bruises on her body.
Defendant, who was babysitting the victim alone on the evening in question, was charged by indictment with murder in the second degree (depraved indifference), manslaughter in the first degree and endangering the welfare of a child in connection with her death. During the ensuing jury trial, the People presented evidence in support of their theory that the victim did not accidentally fall from a bunk bed, but, rather, was injured during the course of physical abuse perpetrated by defendant, who then delayed seeking medical care for her despite knowing that she was gravely injured as a result of his conduct. Defendant was convicted as charged. County Court denied defendant's CPL 330.30 motion to set aside the verdict and sentenced him to a prison term of 25 years to life for the second-degree murder conviction, with lesser concurrent terms of incarceration, and a period of postrelease supervision, on the remaining convictions. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is contrary to the weight of the evidence, arguing that the People failed to prove that he caused the victim's death or acted with depraved indifference.[FN1] Defendant's legal sufficiency challenge is adequately preserved for appellate review (see People v Ambrosio, 235 AD3d 1181, 1182 [3d Dept 2025], lv granted 43 NY3d 967 [2025]). As charged in the indictment, a person is guilty of depraved indifference murder of a child when, "[u]nder circumstances evincing a depraved indifference to human life, and being [18] years old or more [he or she] recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than [11] years old and thereby causes the death of such person" (Penal Law § 125.25 [4]). The Court of Appeals has limited this theory "only to a small, and finite, category of cases where the conduct is at least [*2]as morally reprehensible as intentional murder" — when the facts "reflect wanton cruelty, brutality or callousness directed against a particularly vulnerable victim, combined with utter indifference to the life or safety of the helpless target" (People v Suarez, 6 NY3d 202, 207, 213 [2005]; accord People v Nelligan,135 AD3d 1075, 1078 [3d Dept 2016], lv denied 27 NY3d 1072 [2016]). "Put simply, the People must prove that defendant did not care whether his victim lived or died" (People v Barboni, 21 NY3d 393, 400 [2013]). "Additionally, the People must prove a second mens rea, namely . . . recklessness as to a grave risk of serious physical injury or death" (id.).
There are two recurring fact patterns under which depraved indifference murder convictions have been upheld based upon conduct endangering only one person: where the defendant "abandon[ed] a helpless and vulnerable victim in circumstances where the victim [wa]s highly likely to die" or "engage[d] in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim" (id. at 403[internal quotation marks and citation omitted]). However, "these fact patterns d[o] not constitute an exhaustive list of situations in which a defendant may properly be convicted of depraved indifference murder based on a one-on-one killing" (id.). Indeed, the relevant question is whether the defendant acted with the requisite mens rea (see id.).
As for the other charges, a person is guilty of manslaughter in the first degree under Penal Law § 125.20 (4) when, "[b]eing [18] years old or more and with intent to cause physical injury to a person less than [11] years old, the defendant recklessly engages in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person." "A person acts recklessly . . . when he [or she] is aware of and consciously disregards a substantial and unjustifiable risk" (Penal Law § 15.05 [3]), and acts intentionally with respect to a result "when his [or her] conscious objective is to cause such result" (Penal Law § 15.05 [1]). A person is guilty of endangering the welfare of a child when "[h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than [17] years old" (Penal Law § 260.10 [1]).
The trial evidence established that, on the evening in question, defendant was babysitting the victim in the downstairs apartment of a two-family residence, which he shared with the victim and the mother. The mother was at work at the time. At 7:17 p.m., defendant texted the mother that the victim had fallen off the top bunk of one of the bunk beds in her room. When the mother asked whether the victim was hurt, defendant replied, "yeah I think she really hurt herself [be]cause she wanted to sleep right after." Around 8:00 p.m., defendant informed the mother that the victim had gone "right to sleep" and, when the mother replied that she hoped [*3]the victim was okay, defendant stated "[m]e to[o] . . . lol she must be beat cause she didn't wake up for me." After exchanging additional text messages, including ones in which defendant engaged in a sexually explicit conversation with the mother, the mother repeated that she hoped the victim was okay and defendant responded "[s]he will be lol."
At 8:59 p.m., approximately an hour and 45 minutes after defendant informed the mother that the victim was hurt, he called 911, reported that the victim did not appear to be breathing and advised that he had "given her mouth-to-mouth." When first responders arrived on scene, the front door to the residence was open and defendant was performing chest compressions on the victim, who was lying on the floor in the living room. Defendant held a floor lamp for first responders to aid in their resuscitation efforts and, when he was interviewed on-scene, he repeated the story about the bunk bed, explaining that the victim likely fell while she was trying to straighten a picture on the wall. One of the responding police officers noticed that a picture in the victim's bedroom was a bit crooked and testified that, to straighten it, a person would need to reach approximately two feet to the left of the top bunk. Defendant also informed the officers that he had given the victim half a tablet of Benadryl earlier in the evening. The officers described defendant as "distraught" and crying while he was recounting what had happened. Some of the first responders also smelled alcohol on defendant's breath and vomit on his clothing. There was also testimony that the victim's body was grey and cold to the touch when first responders arrived on scene, indicating that she had been deceased for some time, notwithstanding that the residence was extremely hot.
When defendant was interviewed at the Sheriff's Department later that evening, he expounded upon the period leading up to the subject incident. Although he gave several conflicting statements during the interview, he recounted that that he had driven the mother and another individual to work around 3:15 p.m., bringing the victim with him. He subsequently stopped at a liquor store, returned home with the victim between 3:30 and 4:30 p.m., took three shots of alcohol, and played a video game in the living room while the victim colored next to him. Defendant relayed that he subsequently began watching TV in the living room while the victim colored alone in her bedroom, which had two sets of bunk beds in it. According to defendant, approximately 30 minutes later, he "heard a bang," went to the victim's room, and found her on the floor near one of the beds crying and breathing erratically, confirming that she was gasping for air and that her breathing was labored. Defendant then allegedly brought the victim to the living room and played a video game while she fell asleep. According to defendant, the victim "started breathin[g] really [h]eavy . . . [a]nd she started puking a little [*4]bit," prompting him to start shaking her and slapping her face to wake her. He called 911 when those efforts did not work.
Notwithstanding defendant's version of the events, the People presented both testimonial and physical evidence in support of their theory that the victim's injuries did not result from a mere accidental fall off a bunk bed. In addition to eliciting testimony from several first responders who described "bruising over [the victim's] entire body," some of which "looked like . . . fingerprints" and "appeared . . . very fresh," the postmortem photographs of the victim's body confirmed these descriptions. The autopsy report was also entered into evidence, which described a depressed skull fracture on the right side of the back of the victim's skull, "[f]resh" hemorrhages in the mesentery of the small intestine and the ano-rectal area, a 1¼ by 1¼ inch indentation on the left side of the victim's scalp, a contusion on the right side of her scalp just above her ear, and a "palpable hematoma on the left and right sides of the vertex of the scalp." The report listed the existence of over 50 "contusions and abrasions, involving scalp, face, lips, neck, torso and all four extremities," including bruises on the back of each of the victim's hands, on her back and around her knees. There was a laceration on the right side of the undersurface of the victim's upper lip, with contusions on each side, as well as other lacerations on different areas of her body. A small area of soft debris resembling fecal matter was found on the roof of the victim's mouth, which subsequently tested positive for feces on presumptive screening tests. However, the forensic scientist who performed the tests testified that they were not confirmatory and, accordingly, could not say with 100% certainty that the debris was feces.
In an attempt to establish that defendant caused the victim's injuries, the People elicited testimony from a resident of the upstairs apartment who testified that, between 5:00 p.m. and 6:00 p.m. on the evening in question, she heard a man yelling loudly in the downstairs apartment where defendant was, by his own account, alone with the victim. She then heard a "thud" in the downstairs apartment a little after 7:00 p.m., testifying that it rattled the dishes in her kitchen and sounded like someone moving furniture. She did not hear any additional noises from that location.
The mother also testified regarding her observations of the victim's body earlier in the day, explaining that she was home with the victim and defendant until the afternoon and had changed the victim's diaper that morning. The mother testified that there were "a few" preexisting bruises and cuts on the victim's body from prior accidental incidents, but that the majority of the bruising depicted in the autopsy photographs was not present before she left the victim in defendant's care. The mother further confirmed that the subject bunk bed had been delivered to the residence [*5]two days prior and that the victim had attempted to climb to the top twice, succeeding once and attempting to take the pictures off of the wall next to the bed on that occasion. The victim had also fallen off the first step of the bunk bed's ladder two days before the underlying incident. Nevertheless, the mother testified that she believed defendant was "lying to [her]" about the victim falling from the bunk bed on the evening in question, revealing that, during a conversation with defendant while he was in jail awaiting trial on the underlying indictment, he told her that "he would tell [her] the truth . . . after this was all over."
As for the physical evidence, investigators found at the residence two 24-ounce beer cans, one empty and one partially full, as well as five empty 50-milliliter vodka bottles and a bottle of Benadryl. A coloring book and a partially eaten chocolate candy bar were also found in the victim's bedroom in the vicinity of where she allegedly fell. A therapeutic dose of Benadryl was identified in the victim's system and, upon laboratory testing, her blood was confirmed to be on several items in the apartment, including on the collar of a pair of children's pajamas found in the living room, on bedding from the lower bunk of the bunk bed, and on defendant's pants.
Investigators also located an indented piece of drywall below a light switch in the hallway of the residence. The indented portion of the drywall had a crack that was in a circular formation, with the area of damage approximately 4½ inches in diameter. A strand of hair was embedded within the cracked portion of the wall, which, upon laboratory testing, was confirmed to be the victim's hair. The damaged portion of the drywall was located 29 inches above the floor and the victim was 34.5 inches tall at the time. Although the mother testified that she and defendant had been in an argument two days before the subject incident, during which they threw objects down the hallway, she had never seen damage to any wall in the apartment, including after the argument. The mother's landlord, who visited the apartment two days prior to the evening in question, also did not recall seeing any damage to the walls, though he could not remember whether he had walked down the hallway on that date.
The People also called the pathologist who performed the victim's autopsy to provide expert testimony. The pathologist testified that several of the victim's injuries were consistent with blunt force trauma and that that they did not happen simultaneously. He further testified that the fatal injury was the depressed skull fracture, explaining that the victim "was most likely rendered immediately unconscious or at least stuporous" from the fracture. Although he opined that the victim probably survived for at least an hour after sustaining the skull fracture, he testified that she likely would have died regardless of whether she had received prompt medical care. The pathologist did not believe [*6]the depressed skull fracture resulted from a fall off a bunk bed given the existence of the other blunt force injuries and extensive bruising all over the victim's body. He further acknowledged that resuscitation efforts could have, in theory, produced some of the bruising and lacerations, but did not believe this was the cause of the vast majority of the bruising. Aware of the cracked and indented piece of drywall found at the residence that had a piece of the victim's hair embedded within it, the pathologist opined that the victim's fatal injury likely was caused by her head hitting the drywall.
In an attempt to refute this theory, defendant called three witnesses to testify on his behalf. To that end, a retained forensic consultant testified regarding what he believed to be numerous deficiencies in the investigation, including the use of improper evidence collection techniques and inadequate crime scene preservation procedures. Defendant also presented testimony from an aerospace engineer who conducted experiments to determine the manner of death.[FN2] Contrary to defendant's contention, County Court did not abuse its discretion in limiting the scope of the aerospace engineer's testimony (see generally People v May, 188 AD3d 1309, 1310 [3d Dept 2020], lv denied 36 NY3d 974 [2020]). According to this witness, his testing revealed that a fall from the bunk bed — which was approximately five feet, five inches in height — would have produced enough velocity to cause the victim's skull fracture and could have also possibly caused the other injuries. In contrast, when he performed experiments regarding the People's theory, they demonstrated that the amount of force required to create an indentation in the drywall was significantly less than the amount of force that would have been generated from a fall from the bunk bed. He did not believe that the amount of force required to create an indentation in the drywall would be sufficient to fracture a skull and testified that the indentation pattern in the drywall was not consistent with a head-shaped object hitting it.
Defendant also called a forensic pathologist, who explained that, due to the way the scalp, brain and skull develop in young children, there are "rare" cases in which short falls can be fatal. Although she agreed with the People's pathologist that the skull fracture was the fatal injury and that the victim would likely have died regardless of whether she had received prompt medical attention, she testified that the victim's head injury was consistent with a fall from a bunk bed. Defendant's pathologist also took issue with the manner in which the People's pathologist performed the original autopsy and proffered accidental explanations for several of the victim's injuries — including that her abdominal injury may have been caused by her stomach hitting the bed's ladder and that the blood in the ano-rectal region could have resulted from a bowel movement given that the victim suffered from constipation[*7]. She also posited that the exterior bruises and lacerations could have been caused by resuscitation efforts. The pathologist could not precisely date the bruises on the victim's body, but believed that some of them were sustained within 18 hours of the victim's death and acknowledged on cross-examination that she would have made a report of suspected child abuse had she performed the original autopsy.
In support of his legal sufficiency challenge, defendant contends that the People failed to present proof from which the jury could conclude beyond a reasonable doubt that the victim's fatal injury occurred by reason other than an accidental fall from a bunk bed. Therefore, he argues, the People failed to establish that he caused the victim's death or acted with depraved indifference to human life. We disagree. When viewing the foregoing evidence in the light most favorable to the People — as we must during a legal sufficiency review (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Guevara, 240 AD3d 1083, 1083 [3d Dept 2025]) — there is a valid line of reasoning and permissible inferences from which a rational jury could conclude beyond a reasonable doubt that defendant inflicted the victim's fatal injury during a course of physical abuse and acted recklessly as to a grave risk of serious physical injury or death by failing to obtain prompt medical treatment for her despite knowing that she was seriously injured and having trouble breathing (see People v McLain, 80 AD3d 992, 996 [3d Dept 2011], lv denied 16 NY3d 897 [2011]; People v Varmette, 70 AD3d 1167, 1170 [3d Dept 2010], lv denied 14 NY3d 845 [2010]). As for whether defendant acted with a wanton disregard for the victim's life, "[t]he mens rea of depraved indifference . . . can, like any other mens rea, be proved by circumstantial evidence" (People v Feingold, 7 NY3d 288, 296 [2006]). Here, the jury heard testimony that the victim suffered three distinct injuries that were consistent with blunt force trauma and were not all inflicted simultaneously, and that she had extensive bruising on her body that was largely not present before she was left in defendant's care. From this evidence, a rational jury could conclude that there was a level of brutality in the manner in which the injuries were inflicted. This evidence of a brutal assault, combined with defendant's nonchalant text message exchange with the mother after informing her that the victim was injured and his delay in seeking medical care for over an hour after he became aware, by his own admission, that the victim was having trouble breathing, was "sufficient . . . for a jury to conclude that defendant evinced a wanton and uncaring state of mind" (People v Barboni, 21 NY3d at 402; see People v Warrington, 146 AD3d 1233, 1236 [3d Dept 2017], lv denied 29 NY3d 1038 [2017]).
Defendant additionally argues that the People's abuse theory, if accepted, would establish that he acted with intent instead of indifference to human life, precluding [*8]a conviction under Penal Law § 125.25 (4) as a matter of law. Although a conviction of depraved indifference murder is untenable where the proof establishes that the defendant's intent was to cause serious physical injury or death to the victim (see People v Barboni, 21 NY3d at 404; People v Feingold, 7 NY3d at 294; People v Suarez, 6 NY3d at 209; People v Gonzalez, 1 NY3d 464, 468 [2004]), the proof in this case "does not lead to the exclusive conclusion" that this was defendant's conscious objective (People v Hall, 182 AD3d 1023, 1027 [4th Dept 2020] [internal quotation marks, brackets, and citation omitted], lv denied 35 NY3d 1045 [2020]; see People v Waite, 145 AD3d 1098, 1102 [3d Dept 2016], lv denied 29 NY3d 953 [2017]). Indeed, "[t]he extensive injuries suffered by the [victim] . . . do not in themselves require the conclusion that [defendant] intended to cause serious physical injury or death" and may have been "explicable in light of h[er] tender age" (People v Barboni, 21 NY3d at 404).
We are similarly unpersuaded by defendant's argument that "there was no evidence of a brutal and prolonged course of conduct necessary to support a depraved indifference charge." To the contrary, the jury heard evidence from which it could conclude that the victim was subjected to a course of abusive conduct that unfolded over a period of time and "[t]here is no requirement in our case law that a violent course of conduct must occur over days or months, in order to be 'prolonged' " (id.). Even if the victim sustained her injuries during an assault that was brief in duration, defendant also delayed seeking medical care for her for nearly two hours despite knowing that she was injured and having trouble breathing, thereby "turn[ing] a brutal assault into a brutal and prolonged course of conduct against a vulnerable victim" (id.). On this record, we conclude that the evidence is legally sufficient to support the verdict on all charges.
Turning to the weight of the evidence, a different verdict would not have been unreasonable, as defendant's delay in obtaining medical care for the victim in a scenario where she fell from a bunk bed — i.e., where he was not "the actor who had inflicted the injuries in the first place" (id. at 402) — would not establish the type of wanton disregard for human life necessary to sustain a depraved indifference murder conviction, despite the proof that he knew she was injured (see People v Verneus, 184 AD3d 678, 680-682 [2d Dept 2020]). Nonetheless, when viewing the evidence in a neutral light and weighing the "relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn [therefrom]" (People v Sanchez, 32 NY3d 1021, 1023 [2018] [internal quotation marks and citations omitted]), we are satisfied that the People's abuse theory, although premised solely upon circumstantial evidence, "is the only one that can fairly and reasonably be drawn from the facts, and that the evidence [*9]excludes beyond a reasonable doubt every reasonable hypothesis of innocence" (People v Baque, 43 NY3d 26, 30 [2024] [internal quotation marks and citation omitted]; accord People v Stowe, 240 AD3d 946, 949 [3d Dept 2025]).
The victim's injuries were not consistent with an accidental fall from a bunk bed. The People presented compelling evidence that defendant inflicted the victim's injuries during a brutal course of physical abuse, including testimony from an upstairs neighbor who heard a man yelling in the downstairs apartment at a time in which defendant was indisputably alone with the victim, testimony from the mother that the vast majority of the victim's exterior bruises were not present when she left the victim in defendant's care, and testimony from the People's pathologist that resuscitation efforts did not cause the majority of the bruising. There was also evidence that a damaged piece of drywall was found in the hallway of the residence at approximately the victim's height that had a strand of her hair embedded in it. Based upon this evidence, along with the mother's testimony that defendant told her he would "tell [her] the truth" when "this is all over," we conclude that the People proved their abuse theory beyond a reasonable doubt. We are mindful of the testimony that defendant belatedly engaged in efforts to help the victim and first responders, and appeared distraught when he was interviewed at the residence and was subsequently informed of the victim's death. However, "[d]efendant's 'state of mind and the real reasons for his later actions implicated credibility questions' for the jury to resolve" (People v Hall, 182 AD3d at 1028 [internal brackets and ellipsis omitted], quoting People v Warrington, 146 AD3d at 1237). Given the evidence that defendant waited over an hour to call 911 and engaged in a sexually explicit conversation with the mother during this time, despite knowing that the victim was injured and having trouble breathing, there is no basis to disturb the jury's determination that defendant did not care whether the victim lived or died and acted with a mens rea of recklessness as to a grave risk of serious physical injury or death (see People v Stahli, 159 AD3d 1055, 1058 [3d Dept 2018], lv denied 31 NY3d 1088 [2018]). We therefore conclude that the verdict is not against the weight of the evidence as to all of the charges.
We do, however, agree with defendant that County Court made several prejudicial evidentiary rulings that deprived him of a fair trial. Turning first to County Court's Molineux ruling, evidence of a defendant's prior bad acts or uncharged crimes is generally "inadmissible where its purpose is only to show a defendant's bad character or propensity towards crime" (People v Saxe, 174 AD3d 958, 960 [3d Dept 2019] [internal quotation marks and citation omitted]; see People v Weinstein, 42 NY3d 439, 443 [2024]). However, such evidence may be admitted where it " 'establishes an element of the crime charged[*10], is inextricably interwoven with the charged crime, provides necessary background, completes a witness's narrative, or falls within the five general Molineux exceptions — i.e., motive, intent, absence of mistake, common plan or scheme and identity' " (People v Hodge, 224 AD3d 1082, 1088 [3d Dept 2024], lv denied 41 NY3d 1002 [2024], quoting People v Hebert, 218 AD3d 1003, 1009 [3d Dept 2023], lv denied 40 NY3d 1080 [2023]; see People v Telfair, 41 NY3d 107, 114 [2023]). Even then, the evidence may be admitted only if "the probative value of the evidence outweighs its potential for prejudice" (People v Hodge, 224 AD3d 1088 [internal quotation marks and citations omitted]).
Prior to trial, County Court partially granted the People's Molineux application to the extent of allowing testimony pertaining to defendant's prior acts of domestic violence and aggression toward the mother, as well as his 2011 conviction of aggravated driving while intoxicated (hereinafter DWI) with a minor in the car. The court concluded that such evidence was relevant and probative to the issues of motive, intent, absence of mistake and lack of accident — particularly given defendant's story that the victim's fatal injury resulted from an accidental fall from a bunk bed — and that the probative value of the evidence outweighed any prejudicial effect. In accordance with this ruling, and over defendant's objection, the People elicited trial testimony from the mother about a December 2017 incident in which defendant became explosively angry while drinking and "trash[ed]" her house; however, "[n]othing was physical" on that occasion. The mother also testified about a January 2018 incident in which defendant was physically violent, revealing that he had repeatedly punched her in the face and in the arm on that occasion. The People were allowed to introduce photographs of the bruises the mother sustained during the January 2018 incident. The evidence regarding defendant's DWI conviction was referenced during his interview at the Sheriff's Department in connection with the underlying incident, which was published to the jury.
The December 2017 incident of aggression did not involve physical violence, as alleged here, and was not probative of any issue in this case (compare People v Polomaine, 89 AD3d 1215 [3d Dept 2011], lv denied 18 NY3d 927 [2012]; People v Engler, 150 AD2d 827 [3d Dept 1989], lv denied 75 NY2d 770 [1989]; People v Tuckerman, 134 AD2d 732, 733 [3d Dept 1987]). Even assuming, without deciding, that the January 2018 incident was relevant to establish lack of accident, the probative value of such evidence was outweighed by the risk of undue prejudice (see generally People v Weinstein, 42 NY3d at 468; People v Hebert, 218 AD3d at 1010; People v Wlasiuk, 32 AD3d 674, 678 [2006], lv dismissed 7 NY3d 871 [2006]). Additionally, the photographs depicting the mother's injuries from the January 2018 incident should not have been admitted into evidence, as they provided the [*11]jury with a visualization of defendant's past violent conduct and were extremely prejudicial in the context of a prosecution requiring proof that defendant acted with a level of depravity sufficient to sustain a conviction under Penal Law § 125.25 (4) (see generally People v Leonard, 29 NY3d 1, 8 [2017]).[FN3] Testimony regarding the fact that defendant and the mother were in a fight two days prior to the underlying incident, during which they threw objects at each other down the hallway of the subject residence, was properly admitted since it provided necessary background information about the days leading up to the event and was relevant to the source of the hole in the drywall (see People v Lewis, 224 AD3d 1143, 1154 [3d Dept 2024], lv denied 42 NY3d 939 [2024]). The remainder of County Court's Molineux ruling was also proper. The evidence pertaining to defendant's 2011 DWI conviction also should not have been admitted, as it was not probative of any issue in the case, did not fit within any recognized Molineux exception, and was unduly prejudicial since it involved a different child and tended to suggest to the jury that defendant was previously reckless with a minor in his care while consuming alcohol. Since the proof of defendant's guilt was entirely circumstantial and was not overwhelming, these improper Molineux rulings cannot be considered harmless (see People v Weinstein, 42 NY3d at 471; People v Saxe, 174 AD3d at 958).
The prejudice to defendant was further compounded by other improper evidentiary rulings. "Under general evidentiary principles, all relevant evidence is admissible unless its admission violates some exclusionary rule" (People v Frumusa, 29 NY3d 364, 370 [2017] [internal quotation marks and citations omitted]). "[E]vidence is relevant if it tends to prove the existence or non-existence of a material fact" (People v Primo, 96 NY2d 351, 355 [2001]). However, even where evidence is relevant, it may be excluded, in the trial court's discretion, "if its probative value is outweighed by the prospect of . . . undue prejudice . . . , confusing the issues or misleading the jury" (id.).
Although County Court did not abuse its discretion in admitting testimony generally referencing that a sexual assault kit was performed on the victim and that the results were negative, the court failed to properly limit the scope of the proof in this regard. Insofar as defendant was not charged with a sex crime and the results of the kit did not support a finding that the victim was sexually assaulted, the People should not have been allowed to elicit testimony from a lieutenant who was present for the victim's autopsy that he observed evidence on the victim's body signifying a possible sexual assault (see generally People v Griffin, 242 AD2d 70, 73 [1st Dept 1998], app dismissed 93 NY2d 955 [1998]). Nor should the court have permitted testimony relative to the fact that police performed a second search of the residence due to a concern that the victim [*12]"could have potentially been subject to some type of sexual assault." The testimony that prostate specific antigen, an enzyme found in seminal fluid, was located on the oral swab from the kit was also improper, as were the references to seminal fluid and sperm, including that some was found on a zebra-striped blanket in the residence and that defendant was the contributor. In the context of this case, the probative value of this evidence, if any, was far outweighed by the risk of undue prejudice to defendant.
Two additional evidentiary rulings warrant discussion. County Court also improperly admitted the results from an Alco-Sensor breath test performed on defendant when the People did not lay a proper foundation establishing that the "machine [was] accurate, . . . working properly when the test was performed and that the test was properly administered" (People v Campbell, 73 NY2d 481, 484 [1989]; see People v Boscic, 15 NY3d 494, 498 [2010]).[FN4] In People v Kulk (103 AD3d 1038 [3d Dept 2013], lv denied 22 NY3d 956 [2013]), this Court held that the Alco-Sensor preliminary breath test is "not admissible to establish intoxication, as its reliability for this purpose is not generally accepted in the scientific community" (id. at 1040). Here, the People were seeking to admit the results of the test not to establish intoxication, but merely to show that defendant had consumed alcohol on the evening in question. However, the People must still lay a proper foundation in order for the results to be admitted. Moreover, under the circumstances of this case, neither the People's pathologist nor the coroner should have been allowed to testify that the victim's manner of death was a homicide (see People v Scruggs, 111 AD3d 966, 967 [2d Dept 2013], lv denied 23 NY3d 1025 [2014]; compare People v Ramsaran, 154 AD3d 1051, 1055 [3d Dept 2017], lv denied 39 NY3d 1063 [2017]). The death certificate and other official documentation listing the victim's manner of death as a homicide also should not have been admitted without redaction. Although we are mindful that the court gave appropriate limiting instructions regarding several of these issues, the cumulative effect of these prejudicial evidentiary rulings deprived defendant of a fair trial. Accordingly, the judgment of conviction must be reversed.
In light of our determination, defendant's arguments pertaining to alleged juror misconduct, the denial of his motion for a mistrial relative to the partial admission of a suppressed interrogation video, and the denial of his CPL 330.30 motion are academic. Defendant's remaining contentions, including those set forth in his pro se supplemental brief, have been considered and found lacking in merit.
Garry, P.J., Aarons, Reynolds Fitzgerald and Ceresia, JJ., concur.
ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Cortland County for further proceedings not inconsistent with this Court's decision.

Footnotes

Footnote 1: Defendant's legal sufficiency challenge is adequately preserved for appellate review (see People v Ambrosio, 235 AD3d 1181, 1182 [3d Dept 2025], lv granted 43 NY3d 967 [2025]).
Footnote 2: Contrary to defendant's contention, County Court did not abuse its discretion in limiting the scope of the aerospace engineer's testimony (see generally People v May, 188 AD3d 1309, 1310 [3d Dept 2020], lv denied 36 NY3d 974 [2020]).
Footnote 3:Testimony regarding the fact that defendant and the mother were in a fight two days prior to the underlying incident, during which they threw objects at each other down the hallway of the subject residence, was properly admitted since it provided necessary background information about the days leading up to the event and was relevant to the source of the hole in the drywall (see People v Lewis, 224 AD3d 1143, 1154 [3d Dept 2024], lv denied 42 NY3d 939 [2024]). The remainder of County Court's Molineux ruling was also proper.
Footnote 4:In People v Kulk (103 AD3d 1038 [3d Dept 2013], lv denied 22 NY3d 956 [2013]), this Court held that the Alco-Sensor preliminary breath test is "not admissible to establish intoxication, as its reliability for this purpose is not generally accepted in the scientific community" (id. at 1040). Here, the People were seeking to admit the results of the test not to establish intoxication, but merely to show that defendant had consumed alcohol on the evening in question. However, the People must still lay a proper foundation in order for the results to be admitted.